## Case No. 16,434.

### UNITED STATES v. TARR et al.

[18 Leg. Int. 214; 4 Phila. 405.]

District Court, S. D. Pennsylvania. 1861.

COUNTERFEITING—ACCOMPLICES—EVIDENCE.

1. If persons are engaged in making counterfeit coin in the house of one who, knowing their guilty purpose, has procured, or facilitated its execution by harboring them in the house, he is, under the twentieth section of the act of congress of March 3, 1825 [4 Stat. 121], guilty of assisting in making such coin.

2. On the trial of a person indicted for this offence, after proof that counterfeit pieces of coin, and certain machines, implements and materials were found in his house in places where they probably could not have been unseen by him, a detective police officer testified that his observation in many other cases in which he had arrested persons in places where counterfeit coins had been found, enabled him to know the purpose to which such machines, implements and materials could be applied. The witness was rightly allowed to testify that they could all be used in making such coin, and that although each one separately might be otherwise used, there was, in his belief, no other use to which they could collectively be applied.

3. The house had been demised to the defendant for a month, and afterwards from month to month, at a certain monthly rent, payable in advance. On signing the lease he paid a month's rent and received the key of the house. Ten days afterwards the house was discovered to have been used by persons engaged in making counterfeit coins. From this time it was vacated, and remained unoccupied until the end of the month. At the end of the month. —the defendant not having been as yet arrested—an unknown person brought the same key which the defendant had received to the same place at which he had received it, and returned it there to the same person from whom he had received it. This having been proved without objection, proof that the bearer of the key said, on returning it, that he was directed to leave it there, was admissible.

The defendants [Daniel Tarr and William B. Tarr], father and son, were prosecuted, under the twentieth section of the act of March 3, 1825, for procuring counterfeit coin to be made, or assisting in making it. Numerous pieces of such coin, finished and unfinished, were found in a house in Philadelphia, in which a man was detected almost in the act of making other pieces. This counterfeiter was then in company with a woman, who must have known what he was doing. Neither of the defendants was then in the house. The defendant William B. Tarr had, about ten days before, rented it for a month, and afterwards from month to month, at a certain monthly rent payable in advance. His father, the other defendant, who occupied a room in it, was approaching it at the time of the detection of the above mentioned counterfeiter, and was arrested at a short distance from it. No counterfeit coin, or other suspicious thing, was found upon the person of the father, or in the room which he occupied. Counterfeit pieces, and machines, implements or materials which might be used in making them, were discovered in every other occupied apartment of the house, in places where they could scarcely have been unseen by any other inhabitant of it. Any one of the machines, implements and materials might, separately, have been used in some innocent employment. But, in their connection with one another, and with the finished and unfinished counterfeit pieces, no reasonable doubt of their purpose or adaptability could be entertained. The son's name was William Barton Tarr. He had subscribed to the lease of the house the name W. Barton. Shortly before leasing it, he had, in company with the same woman found in it as above, twice visited the parties from whom he rented it, calling her his wife; saying that he was going away, and wished to see her permanently settled before his departure. He received, in person, the key of the house when he signed the lease. He then paid a month's rent in advance. A brother of this defendant testified, on his behalf, that he was unmarried; that, in their former correspondence, he sometimes had signed his letters W. Bar-

ton; that these letters were all destroyed; that the two brothers had latterly been engaged together at Camden, New Jersey, in the business of dyeing and scouring; that this business had been finally closed between them on the day after that of the date of the lease, of which lease however this witness knew nothing, and that the defendant, on the day after their business was thus closed, left Camden for New York, to be absent two days. One of the persons from whom the house had been leased proved. for the prosecution, that the house was new, that unexpected delays in the plumber's work had prevented the introduction of the hydrant water, and that, three or four days after the date of the lease, this defendant, then in Philadelphia, complained of the delay; saying that he found it inconvenient to go across the street for water. Upon this evidence, it was contended for the prosecution that the defendant, William B. Tarr, had, upon his return from New York, become the actual occupant of the house; that he could not afterwards have been ignorant of the counterfeiting carried on in it, and that the inference of his guilt was fortified by the circumstance that he had subscribed a fictitious name to the lease. There was also evidence tending to show that, from the time at which the guilty use of the house had been discovered, he disappeared, and was not seen in Philadelphia until his arrest about three weeks later. The house had, in the meantime. been closed and unoccupied until the end of a month from the date of the lease, when the same key which he had received was brought back to the same place at which he had received it by a boy who told the landlords that he was directed to leave it there.

THE COURT instructed the jury that there was no sufficient evidence against Daniel Tarr to show that he had the legal or actual possession, or control, of any part of the house, except the single room, in which no proof of guilt or complicity had been found, and that, consequently, the testimony would not warrant his conviction. The jury found him not guilty. As to William B. Tarr, the court said that if the jury believed him to have actually occupied the other parts of the house, there was evidence from which they might find that he procured or facilitated the use of the house by other persons, for the purpose of making counterfeit coin of the denominations mentioned in the indictment; that if he, knowing persons to be engaged in such business, promoted the execution of their guilty purpose by harboring them in his house while thus engaged, he was guilty of assisting in making the coin, but that he should be acquitted if there was any reasonable doubt of his knowledge of their guilt, or of his participation, thus defined.

The jury found him guilty.

In the course of the trial, a deputy marshal who had assisted in making the discoveries in the house, and had, for several years, been engaged in the performance of such official duty, and had before been similarly employed as a detective police officer in the city of Philadelphia, having examined the machines, implements and materials found in the house, deposed in chief as follows: "From my observation in many cases, during ten or twelve years in which I have arrested parties in places where counterfeit money has been found, I have become capable of knowing to what purpose articles like these, all of which I have seen in such places, can be applied." The defendants' counsel, interposing by leave of the court, cross examined the witness as to the particulars and means of his knowledge, which appeared to be limited to his official experience. The same counsel then objected to any testimony from this witness, as to the purpose to which the articles were adaptable. The court having overruled the objection, the witness testified that they could all be used in making counterfeit coin, and that though each one separately might be applied to some other use, he believed there was no such other use to which they could, collectively, be applied. On a motion for a new trial it was contended that this evidence had been improperly received.                                    •

THE COURT, after an argument by counsel in support of the motion, said:

This question, in modified forms, has often arisen in prosecutions of this class. No special artistic, or professional, or scientific experience is required in order to make an expert as to the subject of the testimony. The coins of the United States cannot be lawfully made elsewhere than at the mint and its designated branches. Public statutes determine what coins may, be lawfully struck; and prescribe the respective weights, forms and impressions of the genuine pieces. The mechanical appliances in use at the mint are simple, and their alternatives are well known. The chemical processes and their substitutes are also familiar. The subject is one which intelligent, well-informed jurors often understand sufficiently, without the testimony of an expert. A rule excluding all persons except officials of the mint from testifying on the subject as experts, would be inconvenient, and, on other grounds, objectionable. Unless this narrow rule should be adopted, the testimony of any person whose attention has been, from any cause, particularly directed to the subject, and whose observation has been, in any mode, particularly bestowed upon it, must be received. The latter appears to be the just rule. Where the witness is a detective police officer, the force of his testimony may sometimes, perhaps, be lessened by the consideration that his experience, from its having been confined to

cases of imputed or suspected guilt, may have rendered him liable to unfavorable prejudices. This objection may, or may not, be removed, in particular cases, by opposing considerations. But the objection, though not thus removed, applies only to the weight of the testimony, without affecting the question of its competency. The force of such an objection was for the consideration of the jury, and not of the court. The testimony was, therefore, admissible.

Another question of evidence, argued on the motion for a new trial, arose upon the testimony of a witness from whom the defendant had rented the house and received the key. This witness testified as follows: "At the end of a month, the key was handed to me by a small boy, who said he was directed to leave it at the office." The defendants' counsel, not objecting to the testimony that the key was returned at the end of the month, objected to the reception of evidence of the message by which it was thus accompanied. The court admitted the evidence on the ground that the message was a part of the act of returning the key; remarking, moreover, that, as the return of the key might be deemed a symbolical surrender of possession of the house, the bearer of the key should, perhaps, be regarded as a messenger impliedly authorized thus to define the purpose of its return.

THE COURT, after hearing the argument in support of the motion, said that although there was no reason to be dissatisfied with the finding of the jury, the case was one in which the verdict should be set aside if any point, even one apparently trivial, had been wrongly decided at the trial against the defendant. But, on this point, the court retained the opinion expressed at the trial, citing the remark of Coleridge, J., in 8 Car. & P. 105, that "many things which pass by words are really acts;" adding that words may, in some cases, be part of an act, and may, in other cases, be demonstrative of its character, that an act might often, therefore, be described imperfectly, without proof of what had been said in performing it; and that in this case, if proof of the return of the key was admissible, a point which was undisputed, the accompanying message was an inseparable part of the act. New trial refused.